UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES | 13-PO-0417 |
| VERSUS | DISTRICT JUDGE DEE D. DRELL |
| DANIEL L. WEBB | MAGISTRATE JUDGE JAMES D. KIRK |

MEMORANDUM RULING

This is a misdemeanor case where the government has charged defendant Webb, the landowner, with aiding and abetting the hunt under 50 CFR 20.21(I) and 18 U.S.C. §2.[1]

On September 1, 2012, opening day of dove season, Federal Wildlife Agents stopped a hunt on defendant Webb's property near Colfax, Louisiana, after having had it under surveillance and observing activities on the land for a week prior. The tract of land is shown on the plat, Govt. Exh. 15, and about 50 acres, perhaps half the tract, was land that was clear, having been burned, with no tilling, discing[2], plowing, raking or other preparation having been performed on it. The rest of the tract was planted in soybeans. The entire tract was not well suited for agricultural crops, although defendant was trying to improve the soil. The tract is bounded on three sides by bayous, also known as coulees. There is an "old home place" on the tract, as shown on the plat.

Every year for the last 10 years, defendant has hosted a dove hunt and 2012 was no exception. About 60 hunters (including defense counsel) were invited to participate and were spaced

---

[1] It is the practice of the U.S. Attorney in this district, generally, not to charge a person with "baiting", which is a Class A misdemeanor and to charge him instead with aiding and abetting the hunt.

[2] A disc is an implement attached to a tractor which is comprised of a row or rows of round blades (discs) intended for the purpose of breaking up the soil.

safely around all sides of the cleared land shown on the plat. The festivities included a big meal. Webb convened a meeting before the hunt and reminded the hunters of basic safety precautions, what is and is not permitted on his land, and told them the land was not baited but reminded them of their obligation of due diligence to check the field for bait before they hunted.

Prior to the day of the hunt, and beginning on August 24, 2012, federal agents examined the field on August 24th, one week before opening day on September 1st. Agent Siragusa testified that that the field was covered with top sown wheat, that is, wheat which had been deposited onto the top of the soil. Some of the wheat seeds appeared to be fresher than others and some had sprouted. See Govt. Exh 1.Some was floating on the top of standing water on the land, indicated it had just been deposited and had not had time to sink to the bottom. See Govt. Exh. 2. A grain cart was observed half full of wheat. See Govt. Exh's. 3 and 4. The agents placed a surveillance camera at the edge of the field.

On August 31st, the day before opening day, the agents retrieved the camera. It contained images, Govt. Exhs. 5, 6 and 7. Agent Siragusa testified that the truck towing the grain cart (spreader) was shown by photos from the camera on August 28th to have traversed the field back and forth depositing grain.

The law applicable to baiting

50 CFR §20.21[3] provides, in pertinent part:

No person shall take migratory game birds:

(i) By the aid of baiting, or on or over any baited area, where a person knows or reasonably should know that the area is or has been baited. However, nothing in this paragraph prohibits:

---

[3] The enabling statute for the CFR's cited herein is 16 U.S.C. §703.

(1) the taking of any migratory game bird, including waterfowl, coots, and cranes, on or over the following lands or areas that are not otherwise baited areas--

    (i) Standing crops or flooded standing crops (including aquatics); standing, flooded, or manipulated natural vegetation; flooded harvested croplands; or lands or areas where seeds or grains have been scattered solely as the result of a **normal agricultural planting, harvesting, post-harvest manipulation or normal soil stabilization practice;**

(2) The taking of any migratory game bird, except waterfowl, coots and cranes, on or over lands or areas that are not otherwise baited areas, and where grain or other feed has been distributed or scattered solely as the result of manipulation of an agricultural crop or other feed on the land where grown, or solely as the result of a **normal agricultural operation**.

50 CFR 20.11 provides, in pertinent part:

(g) **Normal agricultural planting, harvesting, or post-harvest manipulation** means a planting or harvesting undertaken for the purpose of producing and gathering a crop, . . . that is conducted in accordance with official recommendations of State Extension Specialists of the Cooperative Extension Service of the U. S. Department of Agriculture.

(h) **Normal agricultural operation** means a normal agricultural planting, harvesting, post-harvest manipulation, or agricultural practice, that is conducted in accordance with official recommendations of State Extension Specialists of the Cooperative Extension Service of the U.S. Department of Agriculture.

(i) **Normal Soil stabilization practice** means a planting for agricultural soil erosion control

. . . conducted in accordance with official recommendations of State Extension Specialists of the Cooperative Extension Service of the U.S. Department of Agriculture.

(j) **Baited area** means any area on which salt, grain, or other feed has been placed, exposed, deposited, distributed, or scattered, if that salt, grain, or other feed could serve as a lure or attraction for migratory game birds to, on, or over areas where hunters are attempting to take them. Any such area will remain a baited area for ten days following the complete removal of all such salt, grain, or other feed.

(k) **Baiting** means the direct or indirect placing, exposing, depositing, distributing, or scattering of salt, grain, or other feed that could serve as a lure or attraction for migratory game birds to, on, or over any areas where hunters are attempting to take them.

### The Evidence

Agent Siragusa

Since the date of this hunt, Agent Siragusa has retired from federal service after 32 years as a Special Agent, U. S. Fish and Wildlife Service, Law Enforcement Division.

On opening day, the hunters began arriving before noon and dispersed around the field. Agent Siragusa observed hunters shooting pigeons and mourning doves. Because of threatening weather, the agents decided to stop the hunt. Agents Clark and Siragusa shut down the hunt, advised that it was an illegal baited field and spoke with the land's lessee, defendant here, Mr. Webb. Webb told the agents that he had distributed wheat seed on the field 7 or 8 times since July and had never covered it with soil.[4] Webb told the agents he had "been doing this" for 10 years, had never prepared the field and always top sows the wheat. When asked why he had applied the wheat so

---

[4] At trial Webb testified that, upon reflection, he had spread wheat 6 times.

many times he explained that the birds kept eating it. Webb told the agents that the wheat was planted to improve soil quality and for erosion control. When asked why he did not cover the seed with soil Webb told them that "there is certainly some intent to shoot birds out here; obviously, that is what some of this is about." Agent Clark's testimony corroborated Siragusa's recollection of the statement.

Agent Siragusa testified that he did not observe any significant erosion or ruts on the hunted portion of the field. The only area where he did observe some erosion was next to the bank of the bayou in two areas on the southern boundary, marked by "X's" on the plat.

Agent Siragusa testified that hunting over top sown wheat is illegal because it constitutes baiting.

Over a hundred doves were recovered by agents that day.

Dr. Don Reed

Dr. Reed is known to the court and was tendered as an expert witness by the government in establishing food plots in accordance with the official recommendations of the cooperative extension service. Reed is a PhD. wildlife specialist employed by the Louisiana Cooperative Extension Service and has been for 30 years. In his capacity as Wildlife Specialist, he assists private landowners with wildlife management activities on their property. In addition, with input from specialists regarding various crops listed in the publication, he wrote and published in 2000 the publication "Crops for Wildlife Plantings-Recommendations, Establishment and Management" (revised 2005), in evidence as Govt. Exh. 14. In addition, Reed revised and published, with the assistance of another, "Managing Agricultural Areas for Migratory Bird Hunting", Govt. Exh. 13. Having testified more than once as an expert in this court in the past, Dr. Reed was accepted, over

objection, as an expert in wildlife management, including planting recommendations.

Reed explained that he is not an expert on planting all the crops listed and that is why he enlisted other Specialists with the extension service for advice and information. The recommendations for wheat were from input provided by the Extension Service's wheat crop specialist. Reed testified that wheat should be planted from September 1st to November 1st, according to the official recommendations shown in Gov't. Exh. 14. That is, the ground should be disced and the grain should be covered to a maximum 1" depth to ensure proper germination. Because wheat is a cool weather crop, it is very heat sensitive and later planting is better. He also testified that one planting is all that should be required for wheat. Top sowing is not within the planting recommendations, he said.

On cross examination Reed explained that if a farmer is not interested in hunting birds, then he can plant his field however he wants. But, if he wants to hunt birds, then he must follow the recommendations of the Extension Service. He also explained that the Crops for Wildlife Plantings' publication, Govt. Exh. 14, contains the Service's official recommendations, while "Managing Agricultural Areas for Migratory Bird Hunting" Govt. Exh. 13, is intended to be informational only.

Dr. Reed also testified that the recommendations he included in the Crops for Wildlife Plantings publication are the Extension Service's recommendations for planting those crops for any purpose.

<u>County Agent Donna Morgan</u>

Ms. Morgan testified for the defense as a lay witness. She is a county agent in Rapides and Grant Parishes and is an extension agent of the LSU Agriculture Center. She said there are no recommendations specifically for planting cover crops or planting for soil stabilization purposes.

However, she said in this part of the state, wheat planting is ordinarily recommended for October 25 to November 24th to 25th, which are the optimal planting dates. She said she would use those dates regardless of the purpose of the crop–whether for cover or for harvest. She said she never provided any recommendations to Webb.

<u>Mike Barnes</u>

Mr. Barnes is a building contractor and retired wildlife agent. He testified as a lay witness. He has been on defendant's hunts in the past and was participating in the one on opening day, 2012. He testified that he observed grain scattered on the property but it was not "excessively heavy". He also testified that he observed "significant erosion" which had cut grooves in the field on, perhaps, 15 to 20 % of the hunted tract.

<u>Defendant Webb</u>

Webb testified that he plants one half of the field in soy beans and one half in wheat as a cover crop and to harvest. He had harvested wheat in June, he said, and then distributed the subject grain on the field. Webb's testimony is considered in more detail, below.

<u>Analysis</u>

Defendant, Mr. Webb, contends that the wheat was planted for two reasons: as a cover crop to improve the soil and to combat erosion. Webb does not dispute Agent Siragusa's testimony and that of Agent Clark that one of his reasons for distributing the wheat was so that the hunters would have a "good hunt", i.e., to attract mourning doves.

Webb, through counsel, argues that there are no Cooperative extension service regulations applicable to farmers who want to grow wheat or want to stop erosion.

a) <u>Normal agricultural exception</u>

Under 50 CFR §20.11(j), the cleared tract was baited because grain was deposited on it which could (and did–see Govt. Exh. 7) serve as an attraction for birds. Nevertheless, if the grain was scattered <u>solely</u> as a result of a normal agricultural operation or a normal agricultural planting or harvesting (or for soil stabilization–see "b", below) then the taking of the birds is not prohibited.

In order to constitute a normal agricultural operation or a normal agricultural planting or harvesting, the placing of grain must be conducted in accordance with official recommendations of State Extension Specialists of the Cooperative Extension Service of the U. S. Department of Agriculture. And it must have been scattered solely as a result of that agricultural operation.

Webb admitted from the very beginning when he talked to Agents Siragusa and Clark that agriculture was not the sole reason for placing the grain on the field and that an interest in hunting doves was also a reason for placing the grain. That alone is enough to end the inquiry. 50 CFR 20.21(i).

Further, the evidence shows that defendant Webb never contacted the Cooperative Extension Service for its recommendations even though he was planning all along to hunt doves on the tract and one of his reasons for placing the grain was to attract doves. He planted the wheat beginning in July and as late as August 28th, all prior to the September 1st date set forth in the official recommendations of the Cooperative Extension Service. He did not prepare a seed bed as required by the regulations and he did not cover the grain to a 1" maximum depth, all as set forth by Dr. Reed in The Cooperative Extension Service's official publication, "Crops for Wildlife Plantings", Govt.Exh. 14.

Defendant argues, though, that he was farming, not planting "food plots" and that there are

8

no recommendations for planting wheat as a crop or for soil stabilization for farmers.

First, even if this were true--which it is not, as will be discussed-- it does not benefit the defendant. For if there are no recommendations applicable by the Cooperative Extension Service, then it is impossible to qualify for the exception provided in §20.21. That section, and the definitions applicable to it (§20.11(g) & (h)) serves as an exception to the baiting provisions but requires that the planting be conducted in accordance with official recommendations of State Extension Specialists of the Cooperative Extension Service of the U. S. Department of Agriculture. If, as defense counsel argues, there are no recommendations then a landowner cannot meet the requirements of the exception and the field remains baited.

Second, what defense counsel overlooks is that the Extension Service does have recommendations for planting wheat and Dr. Reed incorporated them into the publication "Crops for Wildlife Plantings", Govt. Exh. 14. Reed testified those are the recommendations for planting wheat for any purpose and were obtained from the Extension Service Specialists for each listed crop.

Third, and most important, is that there are unquestionably recommendations applicable where there will be dove hunting and they are set forth in the publication "Crops for Wildlife Plantings", Gov't. Exh. 14.

In other words, while a farmer is free to plant his wheat crop in any manner he chooses, regardless of the Extension Service's recommendations, and even if it may not be the best way to achieve a viable crop, where dove hunting is anticipated, the official Cooperative Extension Service recommendations set forth in "Crops for Wildlife Plantings", Gov't. Exh. 14 must be followed in order to fit within the exception to baiting provided in §20.21. Webb failed to follow the recommendations and therefore does not qualify for the exception.

It is clear from the manner in which the wheat was placed, as well as the fact that he began planting it–a cool weather crop–in July, that Webb was not concerned with the viability of the wheat but rather was preparing for his annual dove hunt event. Indeed Webb admitted in his testimony that this was not an agricultural operation (see discussion below in "soil stabilization"). The wheat was open and obvious and served as an attraction for birds. Hunters shot and killed birds over the wheat. Defendant did not comply with the requirements for a "normal agricultural operation" or "normal agricultural plantings, harvests or post-harvest manipulation" and thus is not excepted by § 20.21. Because the wheat was not placed on the tract in accordance with the Cooperative Extension Service recommendations it remained baited through the day of the hunt.

Soil Stabilization (Erosion Control)

Mr. Webb told Agents Siragusa and Clark when the hunt was stopped that erosion control (along with improving the soil and hunting doves) was a reason for distributing the wheat on the field. He explained that he rotated crops and that one half of the field was soybeans and the other was wheat. He had harvested a wheat crop in June and then began top sowing wheat on the field in July. The July planting was for soil stabilization and was not going to be harvested, he said.

Webb was asked his understanding of the regulation relating to planting wheat and hunting doves and he testified that he understood that there are three reasons a person can hunt over top sown wheat: mining reclamation activities, a normal agricultural practice which, he said, "this never was", and for soil stabilization purposes.

As in the case with the agricultural operation regulation, what Webb overlooks is that the regulation permitting hunting over areas where grain is scattered for soil stabilization practices is permitted only where it is conducted in accordance with recommendations of State Extension

Specialists of the Cooperative Extension Service if birds are to be hunted on the land. See 50 CFR §20.11(i); see Govt. Exh. 14. The land must be prepared and the seed covered up to one inch. If a landowner chooses not to plant the wheat for erosion control in accordance with the official recommendations, that is his business, but, under the federal regulation cited above, hunting is not allowed there.

In an attempt to show that the wheat had been placed for soil stabilization purposes, Webb produced a copy of a letter he wrote to Mr. Spears of the Natural Resources and Conservation Service (NRCS) (formerly the Soil Conservation Service). The letter, dated August 8, 2012, just three weeks before the hunt, purports to memorialize Webb's concerns with regard to soil stabilization and soil improvement and states that:

> "Because I intend to host a dove hunt in early September, I felt it was important to document these bona-fide farming practices which are important to the future production on this farm."

The letter is, I find, contrived in a blatantly transparent attempt to create an "alibi" if he was caught by game agents. More important, however, is that there was never any attempt to contact the Cooperative Extension Service as required by the regulation. The regulation, §20.21(i) provides that the soil stabilization must be conducted in accordance with official recommendations of State Extension Specialists of the Cooperative Extension Service of the U. S. Department of Agriculture.

Once again defense counsel argues that the Cooperative Extension Service has no regulations applicable just to soil stabilization. As with the agricultural operation exception, counsel misses the point. While a landowner may attempt erosion control in any manner he wishes (subject to applicable state or federal regulation), where hunting will be done over the area, the official recommendations of the Cooperative Extension Service set forth in "Crops for Wildlife Plantings",

Gov't. Exh. 14, must be complied with. 50 CFR §20.21(i).

Webb does not meet the criteria set forth in 50 CFR §20.21(i). First, the soil stabilization was not the sole reason the wheat was distributed, as required. Webb admitted that one of the reasons was "to have a good hunt". In addition, the court is not convinced that soil stabilization was ever a reason for depositing the wheat. In short, the court does not accept Webb's testimony as credible. First, Agent Siragusa said there did not seem to be a problem with erosion. Even Mr. Barnes, who was one of Webb's guests at the 2012 hunt testified the erosion affected only 15 to 20% of the field. That doesn't explain wheat having been scattered on the other 80-85% of the tract. Further, had Webb been truly interested in erosion control, he would have planted the wheat seed so they had a reasonable chance of becoming viable plants; that is, he would have prepared the land and would have covered the seed with soil and would not have planted in the heat of the summer. The oddity of planting wheat for soil stabilization also does not escape the notice the court. It is common knowledge that, in this area, it is customary to use rye grass, not wheat, for such purpose.

Finally, I note that, except for the testimony of defendant Webb and of Mr. Barnes, not a single photograph or other evidence of erosion was presented to the court.

I find that Mr. Webb did not meet the requirements of the regulation allowing hunting over a soil stabilization area. 50 CFR §20.21(i).

## Conclusion

Because the wheat was distributed on top of the ground and was obvious and could and did serve as a lure or attraction for doves, I find the field was baited. There is no dispute but that Mr. Webb placed the wheat and aided and abetted the hunters who actually shot and killed doves over it. He has not complied with the Extension Service recommendations in order for his endeavor to

be considered a normal agricultural operation or normal agricultural planting, harvesting etc. nor has he complied with the requirements for hunting over a soil stabilized area. The field remained baited through the day of the hunt.

For the foregoing reasons, I find the defendant guilty.

A sentencing date will be set by separate Order.

THUS DONE AND SIGNED in chambers, in Alexandria, Louisiana, on this the 4th day of November, 2013.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE